And we will hear argument next in United States v. Guevara. Mr. Jones. Good morning. Jeffrey Jones for the appellant. Angel Guevara. I'd like to reserve two minutes for rebuttal, if I could. Mr. Guevara was arrested in late 2007. He received a life sentence based on five murders that took place in the spring and summer of 2008 while he was in prison. And the district court clearly erred by finding these murders to have been reasonable – reasonably foreseeable to him because they were new initiatives by a new – a new leader of the gang, and they were driven by new events that arose in 2008. And Mr. Guevara could not have – not have foreseen those events. And there's no question this gang is a – it was a violent, murderous organization. He was convicted of conspiracy to commit murder. And he – he entered the conspiracy obviously knowing the nature of the gang and agreeing to commit murder with the gang. That's undisputed. But during – in 2008, while he was in prison, he was not acting as an order – a leader or organizer at that time, and he wasn't involved in the gang's day-to-day operations. Morris Flores took over leadership from Carcamo, the previous leader, at the time – at the time. And Flores led the gang on two new campaigns that dramatically escalated the aggression and violence of the gang and can't be considered merely the same type of violence that the gang had engaged in before 2008. For instance, extortion was a longstanding activity of the gang. And they extorted from the street, the illicit street vendors, the Neros, and they enforced that with violence. But the 2008 war with the Neros was an unprecedented event. It wasn't a continuation of what the gang did before. But, I mean, even if the specific context of the violence is new, I mean, it's a little tough for somebody who was convicted of three counts of conspiracy to commit murder in aid of the racketeering conspiracy to say, you know, how could I possibly have foreseen that this conspiracy would, like, go on to attempt to murder some other people? I mean, it – right? It's a murderous organization, I think. But if it's enough simply that he knows MS-13 commits murder, therefore, any murder that takes place at any point that he's part of the conspiracy, under the guidelines, I don't think it's – I believe the guidelines indicate it's not that broad. And I'd point to – for the conspiracy joint activity and further into the conspiracy activity by others, three – I believe comment 3D, the commentary. The scope is – it requires some connection to the act, not merely the type of act. And in the briefs, United States v. White Cotton is discussed. And that's a drug conspiracy. But the defendant clearly engaged in drug sales as part of the conspiracy. But he wasn't liable for the acts of others that he had no connection to other than his being part of the conspiracy, the social and historical connection to the criminal group. But wasn't he, after he is arrested, convicted, still participating in the daily affairs of the gang by phone and other visits and giving advice to Flores as to how to run the operation and we have to do – I forget what the phrase was – we have to do our work, which is killing people and selling drugs? I believe not, Your Honor. And that's a critical point because I think that would be very strong – that would be very strong support for the district court's finding. In trial, Abraham Martinez testified that Carcamo, the leader, and Guevara were helping Flores from prison. They were showing him how to do it. And that's really – that's that testimony. He's lumping – Guevara is lumped in – is lumped in with Carcamo. And you look at the actual – the evidence at trial, other than that conclusory statement where he lumps them both together, there was extensive – there was extensive communication between Carcamo and Flores. There were – there was recorded phone calls. There was a reference to them talking three times a week during this critical period. There was no – there was no communication between – between Mr. Guevara and the new leader, Morris Flores, other than that one statement by Mr. – by Mr. Martinez that just says, yeah, he was – they were – they were helping him from prison, both of them together. Nothing specific about Guevara. And I submit that that's a conclusory statement that – that's the support for the – for the PSR's recommendation and the district court's finding. And it's – there'd be evidence of an actual communication between Flores and Guevara if Guevara was actually supporting – supporting Flores's efforts in 2008. How do you respond to the government's argument that if this is error, it's harmless because the record suggests that the guidelines range would have been life anyway? I have a two-part answer for that. Under Count 2, that's conspiracy to commit murder. That can also take you to an advisory guideline range of life. But as I understand it, under that guideline, that conspiracy, these murders would still have to be reasonably foreseeable for – for that to take – because that has to go – the base offense level for that guideline is lower than life unless you have the – unless you bring in the first-degree murder guideline, 2A1.1, I believe. That requires reasonable foreseeable – reasonable foreseeability of the – of an actual killing in the same way – I think it defaults to the same – requires the same finding as we have for Count 1. And second, my second response to that would be, even if it still gets to that level, the five murders being reasonably foreseeable to Guevara is still – it's still going to be – it's still going to be – that's still going to be relevant conduct. And it's going to be part of the sentencing factors. And it's a pretty dramatic – it's a pretty dramatic reason to give him a life sentence if – if the Court was for some reason inclined not to do so otherwise. And I'd note that Carcamo, the actual leader for who these murders were clearly reasonably foreseeable, he ended up with a 39 – a 39-year sentence, not a life sentence. And if the murders were not found reasonably foreseeable to Guevara, I think there's – I don't think it can be considered harmless for that reason, that there is a possibility that it changes the sentencing calculus. Thank you. Before you sit down, can I ask you about the – you've made an argument based on Nishida about the supervised release conditions. Oh, yes. And my question is, in Nishida, we emphasized – I think the condition there said that probation could determine the provider, location, modality, duration, and intensity of the treatment. And we said, well, that could mean inpatient treatment. The language here seems somewhat different. So what would you point to in this condition to say that it's delegating to probation the authority to decide on inpatient treatment? I think it's – it doesn't refer to – to the modality, but it's still everything in the – that treatment, all the details are left up to probation. It's more – it's more open-ended, or at least as open-ended as the condition in Nishida. And I think it's still – the way it's phrased, without any detail, it simply gives the – it simply gives the probation officer the plenary authority to impose any – to require any kind of substance abuse or other treatment that – inpatient or outpatient. It seems to encompass both, I'd say. So could you answer a question for me on the issue of Judge Oslob's – when he stated what the oral sentence was, he misstated the counts. And then the judgment actually has the correct – what's the remedy for that? I mean, Rule 36 says administratively can just change at any time as long as there's notice. And what difference does it make? Is it going to go back and say, okay, I made a mistake in 5, 6, 7, and 8, now it's 26, 27, 28? I – the – the appellant is asking for that. It's a technical error. It doesn't – it doesn't affect – it doesn't affect the sentence Mr. Breyer is serving. It – but the oral – the oral – I'm – in making that claim, I'm relying on the authority that the oral pronouncement of sentence controls. That's the legal sentence. And then the legal – the legal controlling sentence is not referring to the correct counts by number. I realize it's a – it's not a big – a big thing, but I think it's a technical item that should be corrected. And that's how you correct it? But by the judge restating on the record orally the actual counts. Does the defendant have to be there? I wouldn't think so. I wouldn't see any reason for that. Certainly, I would think that's something that the Court could simply just put on the record orally. It's How can the defendant not be there at a resentencing? I'll stand corrected, Your Honor. I don't – I mean, I'm just – I wasn't – I – I should have said I don't know. I don't know if he has to be there. That's the correct answer. Thank you. We took you under your rebuttal time. We'll give you two minutes. I think you can come back. Mr. Krishnamurthy. Good morning, and may it please the Court. My name is Ajay Krishnamurthy. I represent the United States in this appeal. Mr. Guevara's sentence should be affirmed. The district court did not clearly err by finding the five 2008 murders attributable to Mr. Guevara because he advocated for, encouraged, and participated in exactly that type of violence before he was incarcerated. And the appropriateness of the district court's findings are buttressed by the jury verdicts. And there's two jury verdicts that I want to point to. The first is with respect to the special sentencing factor for Count 1, the RICO conspiracy, where Mr. Guevara was convicted of participating in a pattern of racketeering that included both murder and conspiracy to commit murder. And, of course, the second is his conviction for conspiracy to commit murder. I disagree with Mr. Guevara's contention that there is anything new about the cycle of violence that resulted in the five deaths. And specifically with respect to the murder of Neiros, as Mr. Guevara seems to concede, it was a longstanding practice to extort members of the community, including Neiros, which is the taking of property through the threat of violence, so an inherently violent practice. In addition, Carlos Garrido, a former MS-13 member, testified about a 2006 or 2007 conversation in which Guevara and Karkin were both in charge of the enterprise, in which the Neiros were warned that a failure to pay taxes or a failure to pay rent would result in a war between them and MS-13 20th Street. So the district court was asked to decide whether or not an inherently violent practice carried out by a group of gang members who viewed violence more broadly as a means to accomplish their aims as well as accomplish their goal of obtaining money to the Neiros would be reasonably foreseeable, and we don't think that was a clear error. With respect, briefly, to the leader and organizer enhancement, to go to the court's earlier question, there was a former MS-13 member, Abraham Martinez, who testified extensively about that period of time between December 2007, when Mr. Guevara was incarcerated, and the murders in the spring and summer within that six-month period. And he testified that Flores had told him multiple times that he was only in charge because there was no one else, and both Karkin and Guevara were running things from inside custody. They were providing phone calls, they were providing notes. That was also broadly consistent with the way in which MS-13 functioned. It was an enterprise that functioned both inside and outside the prison system, and entering into custody was not a separation from someone's membership in MS-13, but a continuation of that. I'm not sure if the court has any specific questions about either of those two points or the other claims of error, but if there's no further questions on that, I'm happy to submit. So, well, I've got some questions. Can you reconcile for me our decision in Stevens and Nishida as it relates to the challenge to the mental health treatment? And how do you see Stevens, which says the language that was used here is fine, and Nishida, which says the language that was used here is an over-delegation to the probation office? How do you reconcile those two claims as it relates to those two conditions? Yes, Your Honor. Nishida had an additional phrase which specifically said that the probation officer could decide the location, duration, intensity, and modality of the treatment. And I think that more naturally leads to an interpretation that that condition could be used to implement inpatient treatment. So especially under the plain error standard of review in this case, because the language of Stevens specifically blessed the delegation in this manner, we don't think that it's plain error. If there is any ambiguity, this Court could construe the language here to only permit outpatient treatment for mental health and substance abuse. But wouldn't that be contrary to Nishida? No, Your Honor, because Nishida specifically focused on that phrase. In fact, that phrase, which is pointing out all the ways in which treatment can be implemented, I think could be viewed as sort of expanding the delegation of authority rather than limiting it, because it's specifically calling out the duration, intensity, modality, location, whereas the more natural reading, I think, especially under Stevens, is that when there is a probation officer who can direct a supervisee to participate in treatment, that only encompasses outpatient treatment. Well, I guess I don't read Nishida the same way you read Nishida. I think that just is the slippery slope argument, that how much of probation does the district court have to be involved in in the day-to-day supervision? And if you say, well, you need mental health treatment and all the things that go along in the language of Stevens, but then you say, yeah, but they can't put him in custody because that's punishing him. And it seems to me those two cases, you can't reconcile our language as it comes to how much can you delegate to the probation office, and does that mean before the probation officers delegated the authority to make a search without a warrant that has to first come to the court and say, you know, I want to go search without a warrant. Can I get permission? Well, Your Honor, it does seem like Nishida draws a line between requiring treatment and requiring inpatient treatment. As the Court pointed out, it seems like the basis for Nishida was the fact that inpatient treatment is more akin to custody and more akin to punishment than something that could be used to foster rehabilitation. So I think especially under the Plain Air Standard Review in this case, because the language here is identical to that of Stevens, and because Stevens was read to not require inpatient treatment and only require, only allow the probation officer to impose out-of-patient, out-of, sort of out-of-custody treatment, there is no error that requires correction here. Well, what's the remedy here if the challenge to those two conditions is right? Does this Court say you can't enforce him, and then when, if he ever were to get out, they file a 12A, or 12B, excuse me, and just add the conditions when he gets out? That is one option. This Court could also specifically construe the conditions that were imposed to only permit out-patient treatment. And so if it were to do that, then there would be no dispute, even if Mr. Guevara were released in the future. And what's your answer to the question Judge Mullay asked your friend about the discrepancy between the oral sentence and the written judgment? What, if anything, do we need to do about that? I don't think this Court needs to do anything. There is no dispute, and there is no controversy about what Judge Olisip intended to do. Everyone understood that he was sentencing for counts 25 through 30, and so, and the judgment, of course, reflects the correct language. We think under these circumstances, there is no requirement for Judge Olisip to go back and pronounce on the record what the judgment already reflects. And your best case for that is what? Two sort of out-of-circuit cases in our brief, both of which stand for the proposition that sentencing judges will occasionally misspeak. I don't think there's any authority squarely on point, but I think given the circumstances of this case, I think it... No, I understand the logic of it. It's just trying to get to the remedy is a little frustrating because we have all the cases that say the oral pronouncement controls, and to reach that result, we have to say the oral pronouncement doesn't control. I think it's right that the oral pronouncement controls, but it's also, I think, apparent from the record what Judge Olisip intended to say. Obviously, everybody agrees on that, but it's finding a solution, given our case law, is a little tricky. And I think it would be pointless to send it back to Judge Olisip to do a new oral pronouncement, particularly if the defendant has to be returned to court. Yes, Your Honor, and I think also under... Again, this would also be under the Plain Error Standard Review, and so this Court wouldn't necessarily have to decide what the remedy would be in a different instance. Just in this case, it would not require any correction. Right. I mean, my understanding is that what the fear is from the defendant in this case is that somehow it will have consequences down the road, even though it doesn't make any difference how particularly. So I'm just searching for an answer. Yes, Your Honor. I'm not sure that I see any potential consequences given... Well, I don't either, but that's their claim, and they've raised it. Unless the Court has any other questions, I'm happy to submit. Thank you. Thank you. I'd briefly like to address... Counsel mentioned that Guevara was part of some violent threats against the Neros in 2006 or 2007. I don't dispute that. The extortion was a longtime activity of that gang, and it certainly wasn't peaceful extortion. They engaged in violent extortion. However, it wasn't... Things dramatically changed in 2008, and it was a very different situation with the Neros. They didn't have a war with the Neros before, and that it was a departure from the gang's usual activity is shown by the leader in 2008, Morris Flores, wasn't allowed to do that by the gang's higher-ups, and he had to talk the MS-13 higher-ups into allowing them to have their war with the Neros, and he had to overcome internal resistance from the gang. And that just shows that this was a new agenda that was driven by Flores. It wasn't simply the same thing that the gang was doing before 2008. And briefly, with respect to the Stevens case and the Nishida case, I think as I read Stevens, it wasn't the Court wasn't addressing the same argument. It was a challenge to whether the probation conditions in Stevens could be mandatory conditions. And I don't contest here that they can be mandatory. And I don't believe that Stevens was addressing the distinction between a judicial function and an administrative function, and that an inpatient treatment would constitute a greater punishment that has to be imposed by a judge and not can't be left up to an administrative official like a probation officer. And if this was for either, I think the remedy for the potential Nishida violation that I'm arguing or the more minor thing about the counts would be the judge, I think to comply with Nishida, the judge could impose inpatient or outpatient. The judge just needs to specify that. I think the judge has the authority to order either one, given the nature of this case. On a remand for resentencing, assuming the defendant would have the right to be there, and I think that's true, he could also waive it. And I don't know whether he would, but he may not. I don't see why he would want to be there if there was no potential for his sentence to be lowered. Thank you. I thank both counsel. The case is submitted.
judges: THOMAS, MILLER, Molloy